1    Roman E. Darmer (State Bar No. 212578)
     rdarmer@jonesday.com
2    JONES DAY
     3161 Michelson Drive
3    Suite 800
     Irvine, CA 92612
4    Telephone: (949) 851-3939
     Facsimile: (949) 553-7539
5
     Attorney for Defendant
6    EDWARD R. SHOWALTER

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11   UNITED STATES OF AMERICA,          Case No. 8:06-cr-00129-AG

12              Plaintiff,              Assigned for all purposes to
                                        Judge Andrew J. Guilford
13         v.
                                        **DEFENDANT EDWARD**
14   EDWARD R. SHOWALTER,               **SHOWALTER'S AMENDED**
                                        **POSITION REGARDING**
15              Defendant.              **RESENTENCING**

16                                      **[REQUEST FOR JUDICIAL NOTICE**
                                        **AND DECLARATION OF ROMAN E.**
17                                      **DARMER IN SUPPORT OF**
                                        **DEFENDANT EDWARD**
18                                      **SHOWALTER'S POSITION**
                                        **REGARDING RESENTENCING**
19                                      **PROCEEDINGS FILED**
                                        **PREVIOUSLY AS DOCKET**
20                                      **NUMBER 147]**

21                                      Date:      None
                                        Time:      None
22                                      Judge:     Hon. Andrew J. Guilford

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................. 1

II.    FACTS, PROCEDURAL HISTORY AND OBJECTIONS ........................ 2

    A.     Background ................................................................................... 2

    B.     The Ninth Circuit's Reversal of the Original Sentence ........................ 2

    C.     The Post-Remand Proceedings ....................................................... 2

    D.     Objections to the Presentence Report ............................................. 3

III.   SUMMARY OF MR. SHOWALTER'S SENTENCING POSITION ........... 3

IV.    ARGUMENT ..................................................................................... 4

    A.     Applicable Law ............................................................................. 4

    B.     The Government Has Failed to Meet Its Burden of Proving by
        Clear and Convincing Evidence Any Actual Loss Proximately
        Caused by Mr. Showalter and Thus Has Failed to Show Any
        Basis for a 20–Level Specific Sentencing Enhancement Based
        on Loss ......................................................................................... 6

        1.     The Government Has Not Met Its Burden of Proving By
            Clear and Convincing Evidence Any Loss Caused by Mr.
            Showalter, Much Less Greater Than $7 Million in Loss
            Warranting a 20-Level Specific Offense Characteristic
            Increase ............................................................................. 8

        2.     The Court Must Offset Any Claimed Losses by
            Settlement Recoveries Paid to Investors, by Repayments
            to Investors from High Park, by Expenses Paid to the
            Receiver and Trustee, by the Value of Services Provided
            by Mr. Showalter, and by the Value of High Park
            Properties Owned by Investors ............................................ 10

            (a)     Settlement Payments Received by Investors Reduce
                Alleged Actual Loss by at Least $3 Million ................. 10

            (b)     High Park Paid Investors Received at Least $1.58
                Million in Checks and Escrow Distribution
                Payments ....................................................... 12

            (c)     High Park Properties Paid Investors Directly and
                Indirectly in Excess of $392,000 That is Not
                Accounted for on the Whelan List ............................. 14

1
2

**TABLE OF CONTENTS**
(continued)

Page

3
4

(d)   Funds Returned by the SEC to High Park and Used to Pay the Receiver and Trustee Must Offset Any Loss ..................................................................... 15

5
6

(e)   Investors Obtained Control of High Park Properties Resulting in Profits in Excess of $8.43 Million ............. 15

7

(f)   Fifty-Four Investors Own the Bullhead City Property Valued Between $3.93 and $14 Million.......... 18

8
9

(g)   Offsetting Losses by Services Provided by Mr. Showalter to Investors Reduces Actual Loss by over $576,000 ................................................................. 19

10
11
12

C.   The Appraised Values of the High Park Properties at the Time the Receiver Took Control of High Park Along with Other Legally Required Offsets Provide an Independent Basis for the Court to Determine Zero Loss ............................................................ 21

13
14

D.   The Government Has Failed to Prove by Clear and Convincing Any Actual Loss and Thus Has Failed to Show Any Basis for a More than 50 Victims Adjustment ...................................................... 26

15
16
17

E.   The Government's Request for Restitution Is Based on the Same Flawed Assumptions and Lack of Causation That Undermine Its Loss Calculations and It Has Failed to Prove That Any Restitution Award Is Warranted ........................................................... 29

18
19

F.   Mr. Showalter's Extraordinary Post-Sentencing Rehabilitation Warrants A Substantial Downward Variance ...................................... 30

20

1.   Mr. Showalter's Post-Sentencing Rehabilitation .................... 30

21
22

2.   Mr. Showalter Has Already Served a Sentence That Is Sufficient, but Not Greater Than Necessary and No Further Prison Time Is Warranted ............................................. 32

23

3.   A Downward Variance Is Warranted Based on Mr. Showalter's Age and Serious Health Problems ........................ 35

24

V.   CONCLUSION ........................................................................................ 40

25
26
27
28

IRI-40568v6

# TABLE OF AUTHORITIES

**Page**

CASES

*BFP v. Resolution Trust Corp.*,
511 U.S. 531 (1994) ................................................................22

*Pepper v. United States*,
131 S. Ct. 1229 (2011) .......................................3, 4, 30, 31, 32, 34, 35, 40

*United States v. 22.80 Acres of Land*,
839 F.2d 1362 (9th Cir. 1988).................................................22

*United States v. Ali*,
620 F.3d 1062 (9th Cir. 2010)..............................................9, 27

*United States v. Ameline*,
409 F.3d 1073 (9th Cir. 2005) (en banc)................................26

*United States v. Anders*,
956 F.2d 907 (9th Cir. 1992) ..................................................36

*United States v. Armstead*,
552 F.3d 769 (9th Cir. 2008) ..................................................26

*United States v. Barnes*,
125 F.3d 1287 (9th Cir. 1997) ...........................................19, 20

*United States v. Berger*,
587 F.3d 1038 (9th Cir. 2009)..............................................5, 29

*United States v Carty*,
520 F.3d 984 (9th Cir. 2008) ..................................................36

*United States v. Chase*,
560 F.3d 828 (8th Cir. 2009) ..................................................36

*United States v. Clough*,
360 F.3d 967 (9th Cir. 2004) ..................................................36

*United States v. Crandall*,
525 F.3d 907 (9th Cir. 2008)..................12, 16, 19, 22, 23, 24, 25

*United States v. Diaz*,
639 F.3d 616 (3d Cir. 2011) ...................................................30

*United States v. Garcia*,
340 F.3d 1013 (9th Cir. 2003) ................................................36

*United States v. Gerrard*,
2011 WL 5190951 (D. Haw. Oct. 28, 2011)...........................36

*United States v. Hopper,*
177 F.3d 824 (9th Cir. 1999) ................................................................. 5

*United States v. Jordan,*
256 F.3d 922 (9th Cir. 2001) ....................................................... 4, 5, 26

*United States v. Laurienti,*
611 F.3d 530 (9th Cir. 2010) ....................................................... 4, 7, 29

*United States v. Littlesun,*
444 F.3d 1196 (9th Cir. 2006) ............................................................... 9

*United States v. Lomow,*
266 F.3d 1013 (9th Cir. 2001) ................................................. 15, 25, 29

*United States v. Molina,*
934 F.2d 1440 (9th Cir. 1991) ............................................................... 6

*United States v. Munoz,*
233 F.3d 1117 (9th Cir. 2006) ............................................................... 7

*United States v. Najjor,*
255 F.3d 979 (9th Cir. 2001) ............................................................... 29

*United States v. Orton,*
73 F.3d 331 (11th Cir. 1996) ................................................................. 7

*United States v. Reyes,*
No. 06-00556-1 (N.D. Cal. Nov. 27, 2007) ........................................... 5

*United States v. Salinas-Cortez,*
660 F.3d 695 (3d Cir. 2011) ................................................................ 30

*United States v. Showalter,*
569 F.3d 1150 (9th Cir. 2009) ....................................... 2, 4, 6, 7, 8, 26, 27

*United States v. Treadwell,*
593 F.3d 990 (9th Cir. 2010) ....................................................... 4, 5, 26

*United States v. Van Alstyne,*
584 F.3d 803 (9th Cir. 2009) ..................................................... 7, 17, 27

*United States v. Warr,*
530 F.3d 1152 (9th Cir. 2008) ............................................................. 37

*United States v. White,*
506 F.3d 635 (8th Cir. 2007) ......................................................... 35, 36

*United States v. Whitmore,*
35 Fed. Appx. 307 (9th Cir. 2002) ...................................................... 39

*United States v. Zolp,*
479 F.3d 715 (9th Cir. 2007) ................................................................. 5

STATUTES

11 U.S.C. § 704.................................................................................................13

18 U.S.C. § 3553(a) ......................................2, 3, 32, 33, 34, 35, 36, 37, 40

18 U.S.C. § 3561.............................................................................................34

18 U.S.C. § 3563(b) ........................................................................................35

18 U.S.C. § 3583.............................................................................................34

18 U.S.C. § 3583(d) ........................................................................................35

18 U.S.C. § 3664(e) ........................................................................................29

28 U.S.C. § 994(j)............................................................................................35

28 U.S.C. § 2255...............................................................................................6

U.S.S.G. § 2B1.1 ........................................3, 7, 12, 19, 21, 22, 25, 26, 29

U.S.S.G. § 2B1.1(b)......................................................................1, 7, 27, 28

U.S.S.G. § 5B1.1 ......................................................................................34, 35

U.S.S.G. § 5D1.1 .....................................................................................34, 35

U.S.S.G. § 5F1.1 .............................................................................................34

U.S.S.G. § 5F1.2 .............................................................................................34

U.S.S.G. § 5F1.3 .............................................................................................34

U.S.S.G. § 5F1.5 .............................................................................................34

U.S.S.G. § 5H1.1 .....................................................................................36, 39

U.S.S.G. § 5H1.4 .............................................................................................36

RULES

Fed. R. Crim. P. 32(i) ................................................................................4, 26

Fed. R. Crim. P. 32(f) ......................................................................................3

MEMORANDUM OF POINTS AND
AUTHORITIES ISO RESENTENCING

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION.

Mr. Showalter has been in prison for nearly 52 months since this Court originally sentenced him to 151 months' imprisonment on March 3, 2008.  The Ninth Circuit subsequently vacated Mr. Showalter's original sentence and remanded the case for resentencing based on this Court's error in calculating a four-level specific offense characteristic adjustment for more than 50 victims pursuant to section 2B1.1(b)(2)(B) of the advisory United States Sentencing Guidelines ("Guidelines").  On June 29, 2012, Mr. Showalter filed his position regarding resentencing and a motion for leave to file an oversize brief.  (Dkt. Nos. 146, 154).  Following the government's objection to the filing, (Dkt. No. 155), the Court denied the motion and ordered Mr. Showalter to limit his position filing to no more than 50 pages.  (Dkt. No. 159).  Mr. Showalter now submits this amended memorandum of points and authorities and related materials in support of his position regarding resentencing.  The scope of the resentencing proceeding is unlimited pursuant to the stipulation of the parties and Order of this Court.  (Dkt. No. 139.).

For all the reasons set forth below, Mr. Showalter requests that the Court: (i) require that the government be held to a clear and convincing evidence standard for any sentencing enhancements based on actual loss or number of victims because the resulting 24-level increase from the otherwise applicable base offense level of seven would increase the sentencing range by 131-158 months and thus would have a disproportionate impact on his sentence under the Ninth Circuit's "totality of the circumstances" test; (ii) find that the government has not satisfied its burden of proving actual loss directly and proximately caused by Mr. Showalter of more than $7 million warranting a 20-level increase; (iii) find that given the failure of proof of any actual loss directly and proximately caused by Mr. Showalter, a four-level enhancement for more than 50 victims who sustained part of the actual

1  loss is not warranted; (iv) find that because the government cannot satisfy its

2  burden of proving a restitution amount of more than $7 million or any other

3  amount, no restitution award is warranted; and (v) find that regardless of what

4  offense level applies, as a result of Mr. Showalter's extraordinary rehabilitation

5  since his initial sentencing more than four years ago and his low risk of recidivism,

6  advanced age, serious health problems and necessity for medical treatment, a

7  substantial downward variance pursuant to 18 U.S.C. § 3553(a) is warranted.

8  **II.   FACTS, PROCEDURAL HISTORY AND OBJECTIONS.**

9       **A.   Background.**

10          Mr. Showalter incorporates by reference and requests that the Court

11  review the background and personal characteristics discussion in the briefing

12  submitted in connection with sentencing and his motion for bail pending appeal.

13  (Dkt. Nos. 51, 54).

14       **B.   The Ninth Circuit's Reversal of the Original Sentence.**

15          On June 26, 2009, the Ninth Circuit vacated this Court's sentence,

16  holding that it committed error in applying a four-level enhancement for "50 or

17  more victims," because the government had failed to meet its burden of producing

18  any evidence to support the sentencing enhancement, and because the Court's

19  reliance on a bare list of alleged victims attached to the Presentence Report ("PSR")

20  was inadequate.  *United States v. Showalter*, 569 F.3d 1150, 1160-61 (9th Cir.

21  2009).  The Ninth Circuit affirmed the Court's denial of the motion to withdraw the

22  guilty plea.  The mandate remanding the case contained no limitation on the scope

23  of resentencing and thus constituted a general rather than a specific remand.

24       **C.   The Post-Remand Proceedings.**

25          On January 7, 2011, the government filed its position regarding

26  resentencing and requested that the Court re-impose the identical sentence it had

27  imposed in 2008.  (Dkt. No. 97).  In support, the government submitted a

28  declaration of a case agent attaching a list of 64 alleged victims with alleged loss

1  amounts totaling $9.044 million.  (Dkt. No. 97-1) ("Whelan Decl." or "Whelan

2  list").[1]

3  **D.  Objections to the Presentence Report.**

4  Prior to his original sentencing, Mr. Showalter was provided with a

5  PSR dated September 24, 2007.  The PSR was revised on February 15, 2008.  No

6  addendum or revised PSR has been provided to Mr. Showalter.  Darmer Decl.[2] ¶ 8.

7  Pursuant to Fed. R. Crim. P. 32(f)(1), Mr. Showalter incorporates by reference all

8  objections filed by prior counsel and further objects to the PSR on the following

9  grounds:  it does not adequately address the requirements of 18 U.S.C.

10  §§ 3553(a)(1) and (a)(3) (2006); it does not reflect the facts relating to Mr.

11  Showalter's effort to withdraw his guilty plea based on the government's alleged

12  breach; it is based on a list of 117 alleged "victim investors" provided by the former

13  Bankruptcy Trustee that was held inadequate by the Ninth Circuit; it relies on

14  materials provided by alleged victims that have not been provided to Mr.

15  Showalter; it fails to reflect offsets, refunds, or settlements received by alleged

16  victims and thus incorrectly calculates loss amount and victim related

17  enhancements under section 2B1.1; and, most important, it fails to address factors

18

19  [1] On March 30, 2011, the Court denied Mr. Showalter's motion to withdraw his guilty plea pursuant to *Santobello v. New York*, 404 U.S. 257, 262 (1971), based

20  on the government's breach of the plea agreement.  (Dkt. No. 108).  At the hearing on that motion, the government for the first time requested that the Court declare a

21  breach of the plea agreement by Mr. Showalter.  3/30/11 Tr. 17:3-19:2.  The Court denied the relief requested by Mr. Showalter – withdrawal of the plea based on

22  breach of the agreement and transfer to a different judge for further proceedings – and instead granted the government's motion finding Mr. Showalter in breach of

23  the plea agreement.  *Id.* at 19:5-18.  While the Court stated its reasons for declaring a breach of the plea agreement by Mr. Showalter as requested by the government, it

24  did not state on the record any specific findings relating to Mr. Showalter's motion that the government had breached the plea agreement.  3/30/11 Tr. 19:5-21:14.  On

25  September 2, 2011, Mr. Showalter requested that the Court state those findings at resentencing or in a minute order so that there would be a full record for the Court

26  of Appeals.  (Dkt. No. 138 at n.4).  Mr. Showalter renews that request.

27  [2] References in this form are to the Declaration of Roman E. Darmer in Support of Defendant Edward R. Showalter's Position Regarding Sentencing dated

28  June 28, 2012 (hereinafter "Darmer Decl.") and accompanying exhibits. (Dkt. Nos. 147-152).

1   clearly warranting a downward variance for post-sentencing rehabilitation under

2   *Pepper v. United States*, 131 S. Ct. 1229 (2011) and 18 U.S.C. § 3553(a)(1).

3   **III.   SUMMARY OF MR. SHOWALTER'S SENTENCING POSITION.**

4           The government has failed to prove by clear and convincing evidence

5   that the actual loss sustained by 64 investors in High Park that was directly and

6   proximately caused by Mr. Showalter was more than $7 million warranting a 20-

7   level increase in offense level.  The limited evidence available to date demonstrates

8   that there was no actual loss directly and proximately caused by Mr. Showalter

9   warranting either a 20-level increase for loss or an additional four-level increase in

10  offense level for more than 50 victims.  Nor has the government proved any basis

11  for a restitution award of $9.044 million or any other amount.

12  **IV.   ARGUMENT.**

13          **A.   Applicable Law.**

14          The Ninth Circuit's mandate was a general remand that places no

15  limitations on the discretion of this Court in resentencing Mr. Showalter.

16  *Showalter*, 569 F.3d at 1161.  Under *Pepper v. United States*, the law of the case

17  doctrine does not apply and there are no restrictions on the Court's authority to

18  review any and all sentencing factors de novo on resentencing.  131 S. Ct. at 1229.

19          Given the reversal of the original sentence and the Court's subsequent

20  denial of Mr. Showalter's motion to transfer sentencing to another judge, (Dkt No.

21  108), he "has a due process right under the 14th Amendment not to be subjected to

22  vindictive sentencing after successfully attacking a conviction or sentence." *United

23  States v. Laurienti*, 611 F.3d 530, 559 (9th Cir. 2010).

24          As the Ninth Circuit stated:  "[W]hen a defendant raises objections to

25  the PSR, the district court is obliged to resolve the factual dispute, and the

26  government bears the burden of proof . . . .  The court may not simply rely on the

27  factual statements in the PSR." *Showalter*, 569 F.3d at 1159 (citations omitted)

28  (quoting *United States v. Ameline*, 409 F.3d 1073, 1085-86 (9th Cir. 2005) (en

1 | banc)); *see also* Fed. R. Crim. P. 32(i)(3)(B) (requiring district court to rule on

2 | disputed matters at sentencing).

3 | Where, as here, a proposed sentencing enhancement would have a

4 | *disproportionate* effect on the sentence relative to the offense of conviction, due

5 | process requires that the government satisfy its burden by clear and convincing

6 | evidence. *United States v. Treadwell*, 593 F.3d 990, 1000 (9th Cir. 2010)

7 | ("[C]ertain sentencing facts [must] be found by clear and convincing evidence . . .

8 | to ensure that criminal defendants receive adequate due process."); *United States v.*

9 | *Jordan*, 256 F.3d 922, 927-29 (9th Cir. 2001) (holding that the nine-level

10 | enhancement and the more than doubled sentence together had a disproportionate

11 | impact on the sentence warranting the clear and convincing evidence standard).

12 | Given the indisputably disproportionate impact of the 24-level enhancement sought

13 | by the government, the clear and convincing evidence standard should apply to any

14 | findings relating to loss or victim enhancements. *See, e.g.*, *United States v. Hopper*,

15 | 177 F.3d 824, 833 (9th Cir. 1999) (seven-level increase in offense level, more than

16 | doubling the applicable sentencing range, satisfied disproportionate impact test);

17 | *United States v. Reyes*, No. 06-00556-1, at *2 (N.D. Cal. Nov. 27, 2007) (totality of

18 | circumstances test required clear and convincing standard where government

19 | sought an "in toto enhancement of somewhere between 35 and 48 offense levels,

20 | well beyond the *four-level increase* that justified the higher burden of proof in

21 | *Jordan*.") (emphasis added). Darmer Decl. Ex. 245.

22 | Due process requires application of the clear and convincing evidence

23 | standard where, as here, there was no trial establishing the facts underlying the

24 | requested sentencing enhancements, which would quadruple the otherwise

25 | applicable sentencing range. *See, e.g.*, *United States v. Zolp*, 479 F.3d 715, 720

26 | (9th Cir. 2007) (finding that district court properly required government to meet a

27 | clear and convincing evidence standard where it sought a 20-level enhancement in

28 | securities fraud case); *Treadwell*, 593 F.3d at 1000 (no heightened burden of proof

1  for determining loss in a Ponzi scheme case where essential facts had been

2  determined at trial based on a proof beyond a reasonable doubt standard); *United*

3  *States v. Berger*, 587 F.3d 1038, 1048 (9th Cir. 2009) (acknowledging that the

4  Ninth Circuit has not been a "model of clarity" in deciding which types of

5  sentencing enhancements require proof by a clear and convincing evidence

6  standard).  As Judge Breyer put it in *Reyes*, where the government sought to

7  multiply the sentencing range by a significant factor, "Needless to say, searching

8  review [in the form of the clear and convincing evidence standard] is appropriate

9  under the circumstances."  Darmer Decl. Ex. 245, at *2 (citing *United States v.*

10  *Bakhit*, 218 F. Supp. 2d 1232, 1236 (C.D. Cal. 2002) (applying clear and

11  convincing evidence standard where government sought loss enhancement that

12  increased the offense level by more than 34 offense levels)).  No lower evidentiary

13  standard is warranted here.[3]

14         **B.**     **The Government Has Failed to Meet Its Burden of Proving by**

15                **Clear and Convincing Evidence Any Actual Loss Proximately**

16                **Caused by Mr. Showalter and Thus Has Failed to Show Any Basis**

17                **for a 20–Level Specific Sentencing Enhancement Based on Loss.**

18         First, the Court cannot rely on its prior reasoning in finding a 20-level

19  enhancement for actual loss greater than $7 million because the Ninth Circuit's

20  affirmance of this Court's original loss calculation was based on legal authority that

21  has subsequently been rejected by the Ninth Circuit.  Second, the Court cannot

22  make the same finding as to actual loss amount on resentencing because the

23  government cannot meet its burden of proving by clear and convincing evidence

---

24        [3] Although the Ninth Circuit affirmed the Court's denial of the motion to

25  withdraw his guilty plea, Mr. Showalter contends that his guilty plea was induced

by misstatements by prior counsel constituting ineffective assistance of counsel,

26  that there was ambiguity in the plea agreement as a result of inconsistent references
to indictment or information, and because prior counsel failed to raise that issue or

27  to file a reply brief to the government's brief on appeal.  (Dkt. Nos. 8, 21, 51, 115);
Darmer Decl. Ex. 3.  Mr. Showalter reserves the right to make all these arguments

28  in the appropriate collateral proceeding, if necessary.  28 U.S.C. § 2255.  *See*
*United States v. Molina*, 934 F.2d 1440, 1446 (9th Cir. 1991).

- 6 -
MEMORANDUM OF POINTS AND
AUTHORITIES ISO RESENTENCING

that the actual losses directly and proximately caused by Mr. Showalter were greater than $7 million or that there were more than 50 victims who participated in that actual loss.  Third, the Ninth Circuit's opinion reversing the sentence noted that the bare list relied upon by the Court did not support the individual loss amounts allegedly suffered:  "It is impossible to determine from the record whether the probation officer ever inquired into the accuracy of the victim list *or of the individual dollar amounts associated with the names on the list*."  *Showalter*, 569 F.3d at 1161 (emphasis added).  Because the new list relied upon by the government suffers from identical deficiencies, the Court cannot rely on it as a basis for finding loss amount.

The Court may not rely on its findings and conclusions relating to loss amounts under section 2B1.1 because the Ninth Circuit's affirmance of this Court's prior loss calculations was erroneously based on the "risk theory of loss" articulated in *United States v. Munoz*, 233 F.3d. 1117 (9th Cir. 2006), which has since been rejected by the Ninth Circuit.  *Compare Showalter*, 569 F.3d at 1161 (holding, based on *Munoz*, that "calculation of monetary loss may be based on the amount put at risk"), *with United States v. Van Alstyne*, 584 F.3d 803, 817 (9th Cir. 2009) (holding that *Munoz* has been superseded by the amended section 2B1.1 of the Guidelines).  In *Van Alstyne*, the court held that *Munoz* has been superseded by amendments to section 2B1.1 of the advisory Sentencing Guidelines adopted in 2001 and that the "loss to losing victims" rule set forth in *United States v. Orton*, 73 F.3d 331 (11th Cir. 1996), is the applicable rule in this Circuit.  *Van Alstyne*, 584 F.3d at 817-18.  Therefore, this Court must apply the *Orton* "loss to losing victims" rule, which "correctly focuses on the harm to the victims [because those] individuals who receive a 'return' or break even on their 'investments' are not victims for purposes of" the loss calculation provisions of the advisory Guidelines.  *Orton*, 73 F.3d at 334.  *See Laurienti*, 611 F.3d at 557.

It is settled law that individuals cannot be counted as victims for purposes of section 2B1.1(b)(2) unless the losses they suffered were "part of" the district court's determination of *actual* loss under section 2B1.1(b)(1).  *See* U.S.S.G. § 2B1.1 cmt. n.1 (defining "'victim' as any person who sustained any part of the *actual loss* determined under subsection (b)(1)") (emphasis added); *see also Showalter*, 569 F.3d at 1161; *Orton*, 73 F.3d at 334 (("Unless clearly indicated by the guidelines, harm that is merely risked is *not* to be treated as the equivalent of harm that occurred.") (emphasis added)).

**1.    The Government Has Not Met Its Burden of Proving By Clear and Convincing Evidence Any Loss Caused by Mr. Showalter, Much Less Greater Than $7 Million in Loss Warranting a 20-Level Specific Offense Characteristic Increase.**

The Ninth Circuit reversed the prior sentence for this Court's reliance on a bare list of 117 alleged victims with unsupported "loss amounts" attributed to each alleged victim totaling $15,418,500.  *Showalter*, 569 F.3d at 1161.  That evidence was held insufficient to support the four-level sentencing enhancement.  *Showalter*, 569 F.3d at 1160-61.  On resentencing, the government merely repackages the list attached to the PSR, now comprised of 64 investors who allegedly sustained losses totaling $9,044,000.  *Id.*  The new list is wholly inadequate to satisfy the government's burden of proof because it is incomplete and does not accurately reflect all amounts recovered by investors that must be credited against any alleged "actual" loss.

The government acknowledges that many investors in High Park recovered *all* of their investments, but does not indicate the basis for that assertion in the Whelan Declaration, merely stating "I omitted people who recovered their investment, those I did not call, or who did not call me back."  Whelan Decl. ¶ 4. Nor does the Whelan Declaration provide any evidentiary basis for the hearsay

1  statements of some alleged victims.  *Id.*  There are no documents supporting the

2  alleged loss amounts such as sworn declarations from investors and no indication of

3  what steps, if any, were taken by the government to corroborate any of the alleged

4  loss amounts on the list.  *Id.*  The government provides no backup whatsoever in

5  support of the rank hearsay statements comprising the Whelan Declaration.  Darmer

6  Decl. ¶¶ 12-13.

7         While the Court may in appropriate circumstances rely on hearsay in

8  sentencing proceedings, that reliance is only justified where the admitted hearsay

9  "is accompanied by some minimal indicia of reliability."  *United States v. Ali*, 620

10  F.3d 1062, 1073-74, (9th Cir. 2010) (quoting *United States v. Littlesun*, 444 F.3d

11  1196, 1200 (9th Cir. 2006)).  In holding that the district court in *Ali* did not err in its

12  reliance on hearsay spreadsheets offered by the government to support alleged loss

13  amount, the Ninth Circuit noted that the spreadsheets in that case "contained

14  substantial detail and were reviewed both by the IRS agents (who also sent in sworn

15  affidavits regarding the methodology) and Microsoft consultants who reviewed the

16  information."  *Id.* at 1073.  Mr. Showalter's submission demonstrates that the

17  government's list is incomplete, inaccurate and is not accompanied by anything

18  approaching the minimum indicia of reliability required by *Littlesun* and Ninth

19  Circuit case law.  That lack of corroboration is critical where, as here, even the

20  Court has recognized that the "anger [of investors] could lead to exaggeration . . .

21  giving the benefit of the doubt to Mr. Showalter" for purposes of determining the

22  reliability of Whelan's list.  Tr. 03/30/11 25:8-20.[4]  To the extent the Whelan list is

23  based solely on uncorroborated statements by investors who are angry at Mr.

24  Showalter, those statements – like the emotionally charged rhetoric of investors

25  quoted in the PSR or who testified previously – are unreliable and do not satisfy the

26

27

28       [4] References in this form are to the transcript of post-remand proceedings on March 30, 2011.  Darmer Decl. Ex. 105.

IRI-40568v6

- 9 -

government's burden of proving actual loss by clear and convincing evidence.  PSR ¶¶ 21-23; 12/3/07 Tr. 37:12-42:20, 45:1-20[5]; 3/3/2008 Tr. 18:2-27:24.[6]

> **2.     The Court Must Offset Any Claimed Losses by Settlement Recoveries Paid to Investors, by Repayments to Investors from High Park, by Expenses Paid to the Receiver and Trustee, by the Value of Services Provided by Mr. Showalter, and by the Value of High Park Properties Owned by Investors.**

Mr. Showalter has been able to complete only limited investigation as an indigent defendant without access to the resources available to the Probation Department or the government.  *See* Darmer Decl. ¶ 13, Exs. 4-11, 18-52, 117, 118. The results of that investigation demonstrate that the loss amounts in the Whelan list fail to include offsets as required by applicable law for settlements recovered by investors through litigation against third parties; direct repayments from High Park to investors; expenses paid to the Receiver and Trustee; the value of services provided by Mr. Showalter to the investors; and the value of properties that were either profitably sold or still owned by investors.

> **(a)     Settlement Payments Received by Investors Reduce Alleged Actual Loss by at Least $3 Million.**

The Whelan list fails to incorporate substantial recoveries by investors as a result of civil litigation against third parties related to their investments in High Park.  *See* Darmer Decl. Ex. 16 (ten investors had zero loss based on offset of settlement payments).  Specifically, investors received substantial recoveries through settlement of five separate lawsuits against Gateway Title Company, which alleged causes of action ranging from negligence and breach of fiduciary duty to

---

[5] References in this form are to the transcript of the sentencing proceedings on December 3, 2007.  Darmer Decl. Ex. 2.

[6] References in this form are to the transcript of the sentencing proceedings on March 3, 2008.  Darmer Decl. Ex. 3.

MEMORANDUM OF POINTS AND
AUTHORITIES ISO RESENTENCING

fraud, deceit, and conspiracy with Mr. Showalter and High Park in the mishandling of investors' funds. The litigation directly corresponds to the alleged fraud in this case and thus any settlement payments must offset any alleged loss amount. Darmer Decl. ¶¶ 19-22, Exs. 13, 121.

Exhibit 16 to the Darmer Declaration summarizes the payments received by investors as a result of the settlement agreements with Gateway and compares those payments to the amounts on the Whelan list. Darmer Decl. ¶ 24, Ex. 16. At least ten investors recovered the *entire loss amount* alleged on the Whelan Declaration and an extraordinary 42 of the 64 investors on the Whelan list reported *different* amounts than they actually received. *Id.* In sum, the loss amounts on the Whelan list fail to reflect over $3.1 million in settlement proceeds that must be offset against any alleged loss. Darmer Decl. Ex. 16. Given that these settlements were reached in 2008, the information was readily available to the government before it submitted the Whelan list in 2011. Darmer Decl. ¶¶ 21, 24, Exs. 13, 16.

The inadequacy and unreliability of the amounts on the Whelan list is not limited to the omission of $3.1 million in settlement payments from Gateway. Mr. Showalter has identified other recoveries by investors that must be offset against any loss amounts and that are omitted from the Whelan list. For example, there is evidence of other recoveries exceeding $15 million as a result of the settlement of litigations by Bruce Douthit, Esq., on behalf of 80 High Park investors. Darmer Decl. ¶ 31, Ex. 23. While Mr. Showalter attempted to subpoena records relating to those settlements in order to identify specific settlement amounts and investors, to date Mr. Douthit has not complied. Darmer Decl. Ex. 27. As a result, neither the Court nor Mr. Showalter knows the identities of these investors, much less whether some or all of those investors who recovered millions of dollars in settlement payments are also on Mr. Whelan's list of 64 investors. Approximately $10 million of the $15 million allegedly collected by Mr. Douthit

- 11 -

1    must be considered to be in addition to the Gateway settlements, because the

2    Gateway settlements totaled $5.1 million, $3.1 million of which is directly

3    attributable to the 64 investors on the Whelan list.  Darmer Decl. Ex. 16, at 5.

4    While at least $3.1 million in additional settlement proceeds must be offset against

5    any alleged losses sustained by the 64 alleged victims, in addition, it is highly likely

6    that that an additional portion of the $15 million recovered by investors by Mr.

7    Douthit has not been properly offset against any alleged loss amount.

8                    **(b)    High Park Paid Investors Received at Least $1.58**

9                              **Million in Checks and Escrow Distribution Payments.**

10           The Whelan list does not accurately account for all repayments made

11   to investors by High Park or third parties on behalf of High Park.  The limited and

12   incomplete High Park records available to Mr. Showalter reflect in excess of $1.58

13   million returned to investors, with an even larger amount likely returned if complete

14   records were available.  Among other infirmities, the Whelan list is ambiguous as to

15   what source of recoveries each investor claims.  Darmer Decl. Ex. 16.  For

16   example, some entries on the list indicate that the recoveries came from a "lawsuit"

17   without defining the case, while other entries simply state a dollar figure with no

18   explanation at all.  *Id*.  Still other entries merely state a percentage without

19   providing any explanation for *what* the percentage represents or *how* that

20   percentage was calculated.  *See id.*  In sum, it is virtually impossible to discern the

21   source of the reported recoveries incorporated in the Whelan list and, as noted

22   above, there are no backup documents, declarations or other materials to

23   corroborate *any* of the amounts on the list.  Darmer Decl. ¶¶ 12, 21, 24, Ex. 16.

24           Nor has the government made any attempt to identify, much less

25   quantify, payments received from investors in High Park evidenced by checks and

26   closing statements, although those amounts must be offset against any alleged loss.

27   *See* PSR ¶ 34 (stating that the total loss is the total amount of investments made by

28   investors).  Payments received by an investor must be credited against that

1   investor's initial investment in calculating the amount of the alleged loss before the

2   discovery of the fraud.  U.S.S.G. § 2B1.1 cmt. n.3(E)(i); *United States v. Crandall*,

3   525 F.3d 907, 915 (9th Cir. 2008).  Exhibit 17 to the Darmer Declaration

4   summarizes several hundred checks or escrow payments to 32 investors totaling

5   over $1.58 million in the aggregate during the period November 2003 through

6   October 2005.  Darmer Decl. ¶¶ 24-25, Exs. 16-17.  Those repayments are not

7   reflected in the Whelan Declaration but must be credited against any alleged loss.

8   Darmer Decl. Ex. 16 (chart comparing Whelan Declaration's reported recoveries

9   and *actual* recoveries based on payments from High Park).

10          In the course of his investigation, Mr. Showalter discovered many gaps

11   or missing documents from the records made available to him by prior counsel or

12   the Receiver or the Trustee, including escrow closing statements, wire transfers,

13   checks and bank statements.  Darmer Decl. ¶ 9, Ex. 1.  *Id.*  In response to

14   subpoenas, both the Receiver and the Trustee, who had complete control of High

15   Park between November 9, 2005 and November 28, 2011, stated that they had no

16   responsive documents.  Darmer Decl. Exs. 6-9; *see also* Exs. 119-120.  Of course,

17   the Whelan Declaration provides no explanation for what, if any, documents the

18   government has in its possession that provided the basis for its list of alleged

19   victims and amounts.  Whelan Decl. ¶¶ 3-5.  Nor has the government indicated

20   what records it had in its possession as a result of its investigation of the case before

21   filing charges or whether it ever sought records related to High Park from the

22   Receiver or the Trustee.  Finally, there is no explanation as to what the Probation

23   Department did to obtain any of these relevant documents relating to offsets to

24   claimed loss amounts when preparing the original PSR in 2007-2008.

25          Most significantly, there are at least eight missing final escrow

26   statements relating to the sales of certain High Park properties.  Darmer Decl. ¶ 9.

27   It is undisputed that High Park sold 12 properties between December 2003 and

28   October 2005.  Darmer Decl. Ex. 111, at 7.  Of those 12 properties, Mr. Showalter

1  has only received final closing statements for four closed transactions.  Darmer

2  Decl. ¶¶ 19-20, 23, Exs. 10-11 (request for final closing statements from Gateway);

3  Darmer Decl. ¶¶ 26-28, Exs. 18-22 (request for final closing statements from

4  Executive Escrow).  Based on the available closing statements, at least $590,000

5  was paid to investors in connection with the sales of 605 Avenida Teresa

6  ($190,000); 4115 Calle Juno ($205,000); and 32092 Via Alicia ($195,000).

7  Darmer Decl. Ex. 116.  None of the amounts returned to investors in those

8  transactions are reflected on the Whelan list.  Because the other eight sale

9  transactions were of substantial value, the related escrow closing statements are

10  highly likely to show substantial amounts that were repaid to investors and must be

11  offset against any alleged loss amount.  Darmer Decl. Ex. 108 (current depressed

12  value of the eight properties for which Mr. Showalter has not received escrow

13  closing statements totals $6.147 million).

14          In sum, the payments to investors in the form of checks and escrow

15  distributions totaling $1,580,065 must offset any alleged loss amount.  Darmer

16  Decl. Ex. 17.  Moreover, if Mr. Showalter had access to all of the relevant escrow

17  closing statements, they would show substantial additional repayments to investors

18  offsetting any alleged loss. Finally, the omission of these payments from the alleged

19  loss amounts on the Whelan list demonstrates its lack of any minimal indicia of

20  reliability.

21          **(c)      High Park Properties Paid Investors Directly and**

22                    **Indirectly in Excess of $392,000 That is Not Accounted**

23                    **for on the Whelan List.**

24          The Whelan list fails to offset any alleged loss amount by $392,000,

25  which the PSR states was spent on behalf of the investors.  PSR ¶ 95.  Before his

26  original sentencing, Mr. Showalter provided the Probation Department with

27  financial records, including checks and bank statements showing over $392,000 in

28  payments that he or an entity controlled by him made directly to or for the benefit

1   of investors.  PSR ¶¶ 85, 95-96.  The Probation Department informed Mr.

2   Showalter that these files had been destroyed as "immaterial" documents.  *See*

3   Darmer Decl. ¶ 127.  Because it is undisputed that the destroyed documents

4   evidenced payments of approximately $392,000 that "were made to various High

5   Park investors or for their benefit," PSR ¶ 95, any alleged loss must be offset by

6   that amount.  The Whelan list fails to account for these payments or explain the

7   omission.

8                    **(d)    Funds Returned by the SEC to High Park and Used to**

9                            **Pay the Receiver and Trustee Must Offset Any Loss.**

10                  The Whelan list does not account for approximately $977,000 that was

11   indisputably returned to High Park by the SEC and thus available for investors, but

12   that was primarily used to pay fees and expenses of the Receiver and the Trustee.

13   On November 9, 2005, the Receiver took over High Park and ultimately incurred

14   total fees and expenses of $543,269.75.  Darmer Decl. Exs. 110-11; 119, at 2, 6.

15   On July 31, 2006, the Trustee took over control of the estate.  *Id.*  Although no sales

16   were consummated or payments made to investors, the Trustee incurred expenses

17   of $39,930.35.  Darmer Decl. Ex. 120, at 1.  The total fees and expenses for those

18   periods exceeded $583,000.  Darmer Decl. Ex. 119, at 2, 6; Ex. 120, at 1.

19                  The Receiver and Trustee were actually paid those fees only because

20   the SEC had been ordered by the court overseeing the SEC case against High Park

21   to return $977,986 to the High Park estate.  Darmer Decl. Ex. 104.  Those funds

22   had been paid by Mr. Showalter to the SEC to satisfy a judgment in a prior case.

23   PSR ¶ 15; Darmer Decl. Ex. 104.  Since the $977,000 returned to High Park was

24   available for distribution to investors, that entire amount must offset any alleged

25   loss amount.  *United States v. Lomow*, 266 F.3d 1013, 1020 (9th Cir. 2001); Darmer

26   Decl. Ex. 120, at 6.  The Whelan list fails to account for these payments or explain

27   the omission.

28

1           **(e)**      **Investors Obtained Control of High Park Properties**

2                         **Resulting in Profits in Excess of $8.43 Million.**

3        The Whelan list does not account for profits recovered by High Park

4 investors after the Trustee abandoned properties owned by it, and investors or their

5 agents obtained the properties through foreclosure or otherwise, reselling the

6 properties for significant profits. Darmer Decl. Exs. 96, 97, 99-101. It is well

7 settled that "if the fraudulently sold property has been resold by the victim, a

8 comparison of the price on resale to the price paid to the defendant may be a

9 realistic measure of the economic loss to that particular victim." *Crandall*, 525

10 F.3d at 915. Of the 17 properties that were abandoned by the Receiver, 13 were

11 later purchased or foreclosed by alleged victims or their agents for nominal

12 amounts. Darmer Decl. ¶ 108. Based on the limited available information

13 available to him, Mr. Showalter has demonstrated that investors or their

14 representatives profited from or are current owners of properties worth $6.5 million

15 to $14 million based on appraisal values. Darmer Decl. ¶¶ 108-111, Exs. 97, 101.

16 Those amounts must offset any alleged loss claimed by the victims on the Whelan

17 list. *See* Darmer Decl. Ex. 97.

18        Exhibit 97 to the Darmer Declaration lists the 17 properties owned by

19 High Park at the time the Receiver took control. *Id.* That chart also compiles

20 subsequent sales data for each of those properties. Darmer Decl. ¶¶ 108-111, Exs.

21 97, 101. At least 13 of the properties were purchased by former investors or their

22 representatives, many of whom are on the Whelan list. *Id.* at Ex. 97 (list of first

23 purchasers after properties were abandoned); Letter from T. Kieviet to J. Abrams,

24 dated July 23, 2007 as Exhibit A to Docket Number 55 (Dkt. No. 55-A) (list of all

25 members of River Crest Estates, LLC, an entity comprised of former High Park

26 investors that purchased the Bullhead City property); Ex. 27 (stating that Mr.

27 Douthit represented 80 investors but not naming them). The sales price or

28

appraised values of the properties foreclosed upon or purchased by former investors offsets all or substantially all of the alleged loss amounts on the Whelan list.

For example, it is undisputed that Mr. Ralph Irwin, an alleged victim on the Whelan list, foreclosed on 424 Avenida Salvador and later sold it for over $1.2 million in profit, easily offsetting all of his claimed investment loss of $125,000. *Compare* Darmer Decl. Exs. 13, 16, 17, 94, 97, *with* Whelan list. Clearly, Mr. Irwin had no "actual loss" from his $125,000 investment with High Park. In addition to the $1.2 million in sale proceeds, it is undisputed that Mr. Irwin also received a settlement from Gateway in the amount of $65,000. Darmer Decl. Ex. 16.

The Irwin transaction exemplifies what occurred with many of the High Park properties. After the Trustee abandoned them on March 20, 2007, investors foreclosed or purchased them for low "fire sale" amounts and resold these properties for large profits. Darmer Decl. Ex. 97. The Whelan list does not even attempt to account for offsets of this kind nor does it explain why the government did not attempt to determine what other recoveries of this kind were received by the alleged victims as required by *Van Alstyne*. Twelve other properties were either taken over by High Park investors or attorneys known to represent them. Darmer Decl. Ex. 97. Of those 12 properties, six were purchased or foreclosed by attorneys Bruce Douthit, Esq. and Michael Geller, Esq. *Id.* It has not been determined who Mr. Douthit and Mr. Geller represented in these purchases, but they previously represented many of the investors in the civil litigation relating to High Park. Darmer Decl. Exs. 23, 106-107. For example, Mr. Douthit admits on his website that he represented 80 of High Park's investors. *Supra* Part IV.B.2(a); Darmer Decl. Ex. 23. *See also* Darmer Decl. Ex. 27 (Mr. Douthit states he represents 80 investors). Either Mr. Douthit or his company Calico, LLC, Darmer Decl. Ex. 98, foreclosed upon or purchased for a nominal value five High Park properties (3 Marbella, San Clemente, CA; 27091 Calle Juanita, Dana Point, CA; 215 Calle

1    Tinaja, San Clemente, CA; 34562 Via Verde, Dana Point, CA; and 933 Avenida
2    Presidio, San Clemente, CA) and then sold four of these five properties within 24
3    months for profits of approximately $3 million.  Darmer Decl. Ex. 97.  Mr. Geller
4    represented investor Hawshon Riley, who purchased the property at 33333
5    Mulholland Highway, Malibu, CA for $180,000 and then sold it for $200,000.
6    Darmer Decl. Ex. 97 (sales and purchase price), Ex. 17.  Notably, the buyer in that
7    transaction sold the same property *two weeks later* for $1.6 million, representing a
8    profit of $1.4 million in just two weeks.  *Id.*  Of the remaining six properties that
9    were obtained by investors, five were sold for profits exceeding $4 million.  Darmer
10   Decl. Ex. 97.  The last one, an undeveloped property located in Bullhead City,
11   Arizona, is still in possession of investors and has an appraised value between $3
12   and $14 million, as discussed in the following section.  Darmer Decl. Exs. 94, 97.

13           The Whelan list fails to account for offsets based on foreclosure and
14   resale by former investors and the Court must offset any alleged loss by
15   $8,437,831, the sales proceeds received by investors.  Darmer Decl. Ex. 97.  The
16   Whelan list fails to account for these payments or explain the omission.

17           **(f)     Fifty-Four Investors Own the Bullhead City Property**
18                     **Valued Between $3.93 and $14 Million.**

19           The Whelan list does not account for the value of the Bullhead City
20   property that is now owned by 54 former High Park investors, at least 30 of whom
21   are also on the Whelan list as victims.  The Bullhead City property is significant
22   because it consists of 22 acres containing 156 lots zoned for individual
23   manufactured housing units.  Darmer Decl. Ex. 81.  This property almost lost all its
24   value shortly after Mr. Showalter's arrest because Bullhead City sought to rezone
25   the area.  *See* Darmer Decl. Ex. 109.  The Bullhead City property was appraised at
26   $3.93 million at the time the Receiver took control of High Park.  *Id.*  However, in
27   October 2005, at the request of High Park, an experienced local real estate broker
28   provided an opinion letter valuing the property at $13.95 million based on

1  development with full vacancy of 156 manufactured homes.  Darmer Decl. Ex. 81,

2  at 2; Exs. 88, 94.  That appraisal letter explains that the expected value is based on

3  two separate, potential income streams – the potential profit from the sale of the

4  156 houses or undeveloped lots and the potential income stream generated from

5  renting the lots to owners of manufactured homes.  Darmer Decl. Ex. 88.

6         The Bullhead City property is currently owned by River Crest Estates,

7  LLC ("RCE"), a group of 54 investors.  Darmer Decl. Ex. 102, at 1 (stating that

8  RCE invested between $8 and $9 million with High Park, but anticipated that the

9  Bullhead City property "will generate enough money to pay most, if not all, of the

10  investment back to this group of investors"); (Dkt. No. 55-A).  If this property had

11  been resold by these investors, then the Court would have to take into account the

12  profit received by the investors in determining actual loss.  *Crandall*, 525 F.3d at

13  915.  However, since it has yet to be sold, the Court should offset loss by the

14  appraised value of the Bullhead property in possession of the alleged victims,

15  which is between $3.95 million and $14 million depending on the timing of the

16  appraised value.  U.S.S.G. § 2B1.1 cmt. n.3(E)(i); *Crandall*, 525 F.3d at 915.  The

17  Whelan list fails to account for the value of this property or explain the omission.

18        **(g)**    **Offsetting Losses by Services Provided by Mr.**

19                  **Showalter to Investors Reduces Actual Loss by over**

20                  **$576,000.**

21         The Whelan list fails to offset the value of services provided by Mr.

22  Showalter to investors against any alleged loss.  The Ninth Circuit has held that "in

23  calculating amount of 'loss' for sentencing guidelines purposes, the trial court was

24  required to award the defendant credit for [the] amount of services he performed

25  satisfactorily." *United States v. Barnes*, 125 F.3d 1287, 1287 (9th Cir. 1997).  The

26  Ninth Circuit further has acknowledged "extensive precedent . . . that value may be

27  rendered even amid fraudulent conduct." *Id.* at 1291.  In *Barnes*, the court awarded

28  a credit against losses caused by defendant's fraudulent portrayal as a doctor based

on the amount of services performed satisfactorily. *Id.* at 1287. Further, the Ninth Circuit found that the district court erred by "failing to award . . . credit for the value of the services" provided by the defendant. *Id.* at 1291. It is undisputed that Mr. Showalter provided valuable services to the investors and continued to do so even after the Receiver was appointed, including facilitation of the sale of at least 12 properties resulting in profits for many investors, Darmer Decl. ¶¶ 28, 118, 122-25; searching for other real estate opportunities while in parallel supervising the refurbishing and remodeling of properties in preparation for sale, Darmer Decl. Ex. 111, at 7 (Dkt. No. 21-D), Ex. 103; Declaration of Earl Coleman, Exhibit F to Docket Number 21 (Dkt. No. 21-F), Ex. 109; supervising "fifteen to twenty construction workers" and an architect, (Dkt. No. 21-D); Darmer Decl. Ex. 103, at 2; and, preventing rezoning of the Bullhead City property that would have devastated the value of the 22-acre property, all of which substantially benefited investors. (Dkt. No. 21-D); Darmer Decl. Ex. 103, at 3.

Beyond the 12 properties sold by High Park for the benefit of investors, High Park also purchased another 17 properties that were in various stages of remodeling and construction when the Receiver took control and stopped all further construction. (Dkt. No. 21-D). At that time, seven properties were in escrow. *Id.*; *see also* Darmer Decl. Ex. 234. In sum, the fact that High Park purchased 29 properties, renovated 19 properties and sold 12 properties in a two-year time span is indicative of the extraordinary amount of work done by Mr. Showalter that benefitted investors. *See* Darmer Decl. Ex. 103; (Dkt. No. 55-A); (Dkt. No. 21-F); Supplemental Declaration of E. Coleman, Exhibit A to Docket Number 23 (Dkt. No. 23-A); Declaration of J. Miyashiro, Exhibit G to Docket Number 21 (Dkt. No. 21-G); Supplemental Declaration of J. Miyashiro, Docket Number 26 (Dkt. No. 26); Declaration of Scott Harmon, Exhibit D to Docket Number 21 (Dkt. No. 21-D).

1     Moreover, Mr. Showalter's work on behalf of investors continued up

2 through his sentencing on March 3, 2008. (Dkt. No. 55) (stating that investors were

3 appreciative of the work done by Mr. Showalter to save the Bullhead City

4 property). *See* Darmer Decl. Ex. 109. Mr. Showalter continued to assist with both

5 money and expertise to try and prevent further losses. PSR ¶ 95; (Dkt. No. 55-A).

6     Under applicable law, the Court must recognize the value of the

7 services provided by Mr. Showalter and should deduct the value of these services

8 from any actual loss calculation. *Barnes*, 125 F.3d at 1291. The PSR lists Mr.

9 Showalter's monthly income from High Park as approximately $24,000 for the

10 period November 2003 through March 3, 2008, the date on which he was remanded

11 into custody. PSR ¶¶ 85-86. Based on Mr. Showalter's extensive work on behalf

12 of his investors from November 2003 until November 8, 2005, and his monthly

13 salary during much of that period, any loss amount should be offset by at least

14 $576,000 (24 months times $24,000 monthly salary). The Whelan list fails to

15 account for the value of this property or explain the omission.

16     For all the reasons set forth in Part IV.B.2, the Whelan Declaration is

17 incomplete and inadequate because it omits payments or other value received by

18 investors that must offset the alleged $9.044 million loss claimed by the

19 government as follows:

20
21     | Settlements Received By Investors | $3,135,000 |
    |---|---|
    | Payments Received By Investors from High Park | $1,580,000 |
    | Receiver and Trustee's Expenses | $  977,000 |
    | Mr. Showalter's Services to Investors | $  576,000 |
    | Profits from Sale or Possession of Properties | $8,430,000 |
    | Value of Bullhead City Property | $3,930,000 |
    | Total Offsets to Alleged Actual Losses | $18,628,000 |

22
23
24
25
26
27
28

IRI-40568v6

MEMORANDUM OF POINTS AND
AUTHORITIES ISO RESENTENCING

1  **C.      The Appraised Values of the High Park Properties at the Time the**
2  **Receiver Took Control of High Park Along with Other Legally**
3  **Required Offsets Provide an Independent Basis for the Court to**
4  **Determine Zero Loss.**

5        The Court has a separate and independent basis for determining zero

6  actual loss under section 2B1.1 by finding that contemporaneous appraisals of the

7  High Park properties on or around November 9, 2005, when the Receiver took

8  control, prove that there was equity of at least $10.5 million that offsets the $9.044

9  million of actual losses claimed by the government.  That offset is in addition to

10  those offsets described above in Parts IV.B.2(a)-(d), (g), including settlement

11  payments received by investors ($3.135 million); repayments to the investors

12  through checks or escrow distribution payments from High Park or escrow agents

13  ($1.58 million); payments made to and for the benefit of investors as stated in PSR

14  ($392,000); funds returned by the SEC for the benefit of High Park investors

15  ($977,000); and the value of Mr. Showalter's services to investors ($576,000).

16        The Whelan Declaration fails to incorporate any offset for the value of

17  real estate owned by High Park at the time the Receiver took control, which based

18  on contemporaneous appraisals amounted to over $10.5 million in equity available

19  for individual investors even after deducting amounts owed to institutional lenders.

20  Darmer Decl. ¶¶ 105-06.  Loss calculations must take into account the *fair market*

21  *value* of properties at issue.  *See* U.S.S.G. § 2B1.1, cmt. n.3(E)(i).  While courts

22  have several options for determining that fair market value of property, the best

23  indicator of fair market value is actual sales prices, if available, so long as the sales

24  are not in a "forced-sale context."  *See United States v. 22.80 Acres of Land*, 839

25  F.2d 1362, 1365 (9th Cir. 1988) (holding that "the trial court was not restricted to a

26  particular method in arriving at the fair market value for the condemned material");

27  *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 538 (1994).

28

1    However, there are other alternatives that apply in cases such as this

2    one where actual sales prices are not available for all properties.  In *Crandall*, an

3    analogous fraud case involving real property, the Ninth Circuit recognized various

4    methods for determining loss amount and held that in the absence of sales data, the

5    use of appraisals is an appropriate method for determining fair market value.

6    *Crandall*, 525 F.3d at 914.  While the *Crandall* court noted that one of the only

7    drawbacks to use of the appraisal method is the expense and delay in obtaining

8    appraisals, that is not an issue here since Mr. Showalter has provided the Court with

9    contemporaneous appraisals of all properties owned by High Park that were

10   commissioned by the Receiver shortly after taking control.  Darmer Decl. ¶¶ 62-97.

11   As in *Crandall,* the appraisals commissioned by the Receiver were completed on or

12   around the time that the alleged offense conduct occurred and thus are a proper

13   basis for determining loss.  Darmer Decl. Exs. 111, 119.  *See* PSR ¶ 18.

14   Accordingly, if the Court does not apply calculations based on the offsets

15   demonstrated in Parts IV.B.2(e) and (f), it should follow the *Crandall "*no delay"

16   approach and determine the value of pledged collateral using appraised values from

17   on or around November 9, 2005, to determine the amount of actual loss.  *Crandall*,

18   525 F.3d at 915.  Regardless of the valuation approach applied by the Court, it is

19   settled law that the value of the collateral underlying the investments must offset

20   any alleged loss.  *Id.*

21       The facts relating to the appraisals are undisputed.  On November 9,

22   2005, Robb Evans & Associates LLC was named Receiver to "prevent the

23   dissipation, concealment, or disposition of any assets . . . including . . . other

24   interests in real property," having "full power to sue, foreclose, marshal, sell,

25   liquidate, collect, receive and take into possession all such property."  Darmer Decl.

26   Ex. 110, at 7-9.  The Receiver issued an interim report in which it estimated the

27   value of 16 of the 17 High Park properties at nearly $18 million, with institutional

28   debt amounting to $12.8 million, leaving approximately $5 million in equity

available to individual investors. Darmer Decl. ¶ 121, Ex. 111, at 6-7, 16-19. That initial report omitted the Receiver's $4 million valuation for a 4.4 acre industrial property located at 621 W. Rosecrans. *Id.* Thereafter, the Receiver commissioned appraisals from experienced, third-party firms to be completed for the Rosecrans property that resulted in even higher values. Darmer Decl. Ex. 53 (valuing property at $4.1 million as of March 2, 2006); Ex. 89, at 9 (valuing property at $4.7 million as of May 1, 2006); Ex. 90, at 1, 3 (providing valuation opinion of up to $6.5 million and comparable sales between $4.6 and $6.3 million as of April 20, 2006). Including the $4 million appraised value for the Rosecrans property, the total appraised value of the 17 properties was $21.6 million, which amounts to $8.8 million in available value for individual investors after repayment of $12.8 million to institutional investors. Darmer Decl. ¶ 121, Ex. 111.

After establishment of the Receivership, the real estate market began to slow down and by the time the Receiver filed its Schedules with the Bankruptcy Court on August 16, 2006, the value of all 17 properties was reported as $19.2 million. Darmer Decl. ¶ 106, Ex. 95, at 1; RJN ¶¶ 10-16[7]. Even if the Court uses that amount from the Bankruptcy Schedules, the claimed loss to individual investors would still be reduced by $6.4 million. *Id.*

The Receiver hired professional, third-party firms to complete appraisals of the High Park properties. Darmer Decl. ¶¶ 62-97, 105-06, Ex. 119. These appraisals provide reasonable, reliable measures of values for each property at or around the time that Mr. Showalter lost control of High Park. *Id.* The appraisers were experienced and had knowledge of the local community and property values, and at least four of them had MRA or SRA certifications. Darmer Decl. ¶ 97, Ex. 87. In sum, the valuations of the properties were not only completed at the relevant time but were done by independent third parties with the

---

[7] Citations in this form are to the Request For Judicial Notice In Support of Defendant Showalter's Position Re Resentencing (Dkt. No.147-1) and accompanying Exhibits 214-230 to the Darmer Declaration ("RJN").

1   proper expertise, and thus constitute a reliable source upon which the Court can rely

2   in determining offsets to any claimed loss amount.  *Crandall*, 525 F.3d at 915.

3   　　　　　The chart attached as Exhibit 94 to the accompanying Declaration

4   summarizes the appraisals for all of the properties at or around the time the

5   Receiver assumed control.  Darmer Decl. Exs. 53-92.  Of those 58 valuations, 56

6   are the result of appraisals/opinion letters completed at the request of the Receiver

7   (23 appraisals, two opinion letters) or private lenders (16 appraisals) or from the

8   data set forth in the Schedule A filed by the Receiver with the Bankruptcy Court

9   (17 valuations).  Darmer Decl. Exs. 53-94.  Of the 39 appraisals, only three were

10  not produced in response to a subpoena because they had either been destroyed or

11  could not be located.  Darmer Decl. Ex. 94, at n.1.  However, all three of the

12  missing appraisals were located in High Park files.  *See* Darmer Decl. ¶ 9.  Only

13  one appraisal and one broker opinion letter originated from a request by Mr.

14  Showalter rather than the Receiver and they have been excluded from the amounts

15  summarized in Exhibit 94.  Darmer Decl. Exs. 88, 94.  In sum, Exhibit 94 reflects

16  the aggregate "as is" appraisal values of experienced, third party appraisals for the

17  17 properties owned by High Park when the Receiver took control of them ranges

18  from a low of $17.3 million to a high of $23.4 million.  Darmer Decl. Ex. 94. These

19  undisputed appraisal values show that that there was ample equity at the time of the

20  seizure of the estate to repay the individual investors in full had the Receiver or the

21  Trustee consummated any of the pending sales or taken steps to sell any of the other

22  properties, and more than enough equity to offset the entire $9.044 million in loss

23  now claimed by the government, Darmer Decl. ¶¶ 62-104, and thus ample equity to

24  offset any alleged losses by non-institutional investors.  Darmer Decl. Ex. 94.

25  While the valuations do not take into account potential expenses and fees required

26  to sell those properties, as demonstrated above, Mr. Showalter must be credited

27  with any expenses of the Receiver since those are not reasonable and foreseeable

28  losses to the investors incurred by Mr. Showalter.  *Lomow*, 266 F.3d at 1020-21.

1   The undisputed facts are that the Receiver, by failing to harvest the

2   value of any of the properties by selling or completing transactions in escrow in the

3   face of the worsening economy, ensured that the value of the collateral would

4   continue to decline and ultimately fall so low as the financial crisis engulfed the

5   national housing market that only a few investors appeared to profit by obtaining

6   the properties in foreclosure and reselling them for large profits.  RJN, *supra* note

7   7; Darmer Decl. Exs. 94, 97.  Despite the equity available in these properties,

8   instead of selling the properties so the investors could recoup some or all of their

9   investment, the Receiver neglected the properties for nine months until the market

10  turned down further and the value of the properties declined.  (Dkt. No. 21-F); (Dkt.

11  No. 21-G).  The negative consequences of the decision as a result of the

12  contemporaneous collapse of the larger economy cannot be attributed to Mr.

13  Showalter under any recognized loss causation principles.  Thus, the Court should

14  apply the highest "as is" appraisal values to the pledged collateral in accordance

15  with the direction of the advisory Guidelines.  U.S.S.G. § 2B1.1 cmt. n.3.;

16  *Crandall*, 525 F.3d at 912.

17  For all the above reasons, in the event the Court uses the appraisal

18  values of the underlying properties as the methodology for determining actual loss,

19  pursuant to *Crandall,* there is still zero loss.  Moreover, the Whelan list is

20  incomplete and wholly inadequate to sustain the government's burden of proof

21  because it does not even attempt to account for the value of the underlying

22  collateral in determining "actual" loss and also fails to apply the following offsets:

| | |
|---|---|
| Settlements Received By Investors | $ 3,135,000 |
| Payments Received By Investors from High Park | $ 1,580,000 |
| Receiver and Trustee's Expenses | $    977,000 |
| Mr. Showalter's Services to Investors | $    576,000 |
| Pledged Collateral Appraised Value (Equity) | $10,500,000 |
| Total Offsets to Alleged Actual Losses | $16,768,000 |

IRI-40568v6

- 26 -

1      **D.**    **The Government Has Failed to Prove by Clear and Convincing**

2              **Any Actual Loss and Thus Has Failed to Show Any Basis for a**

3              **More than 50 Victims Adjustment.**

4          A victim is as "any person who sustained any part of the actual loss

5  determined under subsection (b)(1) [loss calculation]."  U.S.S.G. § 2B1.1, cmt. n.1.

6  "[I]n order to be counted as a victim, a person *must* have sustained a loss that is

7  'monetary or that otherwise is readily measurable in money' *and* that loss must be

8  included in the loss calculation."  *United States v. Armstead*, 552 F.3d 769, 780–81

9  (9th Cir. 2008) (footnote omitted) (emphasis in original) (quoting U.S.S.G. § 2B1.1,

10  cmt. n.3(A)(iii)).  "[W]hen a defendant raises objections to the PSR, the district

11  court is obligated to resolve the factual dispute, and the government bears the

12  burden of proof. . . .  The court may not simply rely on the factual statements in the

13  PSR."  *Ameline*, 409 F.3d at 1085-86 (en banc); *see also* Fed. R. Crim. P.

14  32(i)(3)(B); *Showalter*, 569 F.3d at 1160.  In addition to bearing the burden of

15  proof as to each victim, the government cannot "estimate the number of victims."

16  *Id.* (quoting *Zolp*, 479 F.3d at 718-19).  The government must be held to a clear and

17  convincing evidence as to a victim enhancement since those four levels, in

18  conjunction with the 20-level loss calculation, results in a 24-level increase in

19  offense level, and thus disproportionately impacts the proposed sentence.  *Jordan*,

20  256 F.3d at 928; *Treadwell*, 593 F.3d at 1000.

21          On appeal, the Ninth Circuit recognized that the government's only

22  basis for a "finding that there were fifty or more victims was: (1) the PSR's

23  statement regarding a phone call to the bankruptcy trustee; and (2) the list of

24  victims attached to the PSR."  *Showalter*, 569 F.3d at 1161.  The Ninth Circuit

25  determined that this basis, even with the testimony of a dozen alleged victims at

26  Showalter's sentencing hearing, "was insufficient to establish that there were fifty

27  or more victims."  *Id.* at 1160-61.  ("Essentially, it appears that the probation office

28

1    said there were 117 victims because the bankruptcy trustee said so, without any

2    explanation as to how the trustee came up with this number.").

3            As shown above, the government has failed to meet its burden of

4    proving by clear and convincing evidence that the "actual loss" here is more than

5    $7 million.  On the contrary, based on the limited evidence available to Mr.

6    Showalter, there is no actual loss. Where, as here, there is no proven actual loss

7    under section 2B1.1(b)(1), there cannot be any victims pursuant to section

8    2B1.1(b)(2) and thus no enhancement for the number of victims.  *Showalter*, 569

9    F.3d at 1161 (stating that "[t]he Guidelines, however, define 'victim,' in relevant

10   part, to include only those people who suffered part of the '*actual loss*' determined

11   under U.S.S.G. § 2B1.1(b)(1).").  As discussed above, recitation of amounts

12   individuals invested in High Park is not probative of anything and reflects a legal

13   theory of loss rejected by the Ninth Circuit.  *Van Alstyne*, 584 F.3d at 818.  The fact

14   that some investors are upset with Mr. Showalter and High Park is also not a

15   substitute for evidence of actual loss, much less an excuse for failing to offset actual

16   recoveries or values that the investors received but failed to report to the

17   government.  That is particularly the case here since the government concedes that

18   many investors *were*, in fact, made completely whole on their investments.  Whelan

19   Decl. ¶¶ 3-4.

20           Just as Mr. Showalter has already demonstrated that the alleged loss

21   amounts reported in the Whelan list are incomplete and lack "some minimal indicia

22   of reliability," *Ali*, 620 F.3d at 1073-74 (quoting *Littlesun*, 444 F.3d at 1200), the

23   number of alleged victims proffered by the government is equally unreliable,

24   incomplete and wholly unsupported by any credible evidence.  *Supra* Part IV.B-C.

25   The government does not even attempt to argue that there were 117 victims as it did

26   at the original sentencing and on appeal.  Of the 64 alleged victims in the Whelan

27   list, Mr. Showalter has shown that at least 15 of those individuals were repaid in

28   full through direct payments from High Park, distributions from the sale of the 12

IRI-40568v6                           - 28 -              MEMORANDUM OF POINTS AND
                                                          AUTHORITIES ISO RESENTENCING

properties or third party settlements.  *See supra* Parts IV.B.2(a)-(b); Darmer Decl. Exs. 14-16, 112-115.  Of the remaining 49 alleged victims, who allegedly sustained total losses of $4,571,966, the government has not proved that there was any actual loss in those specific amounts attributable to those specific investors.  Darmer Decl. 16.  To date, Mr. Showalter has only been able to obtain final closing statements for four of the 12 sales transactions, which in the aggregate resulted in distributions to investors exceeding $690,000.  Darmer Decl. Ex. 116.  If he had access to the remaining eight closing statements, a substantial amount of additional payments to investors would likewise be demonstrated.  *See* Darmer Decl. Ex. 108 (current depressed values for those remaining 8 properties is $6.147 million).  Moreover, as described in Part IV.B.2(a), Mr. Douthit has represented that he recovered $15 million on behalf of the 80 High Park investors but has not responded to a subpoena for documents showing which investors received how much of those recoveries. Darmer Decl. ¶¶ 31, 109, Exs. 23, 27.  Nor are the settlements reported by Mr. Douthit duplicative of the settlements with Gateway.  Darmer Decl. Ex. 27.  Given the amount of unaccounted settlement amounts, the Court cannot rely on the admittedly incomplete and inaccurate list submitted by the government as clear and convincing evidence.

In sum, because the government has failed to meet its burden of proving that a sentencing enhancement of four levels (or more than 53 months) is warranted under section 2B1.1(b)(2), the Court must not apply that enhancement.

**E.**   **The Government's Request for Restitution Is Based on the Same Flawed Assumptions and Lack of Causation That Undermine Its Loss Calculations and It Has Failed to Prove That Any Restitution Award Is Warranted.**

The government bears the burden of proving that restitution is owed to a victim based on "the amount of the loss sustained by a victim as a result of the offense."  18 U.S.C. § 3664(e).  A "victim" is defined as "any person who sustained

1  any part of the actual loss." U.S.S.G. § 2B1.1, cmt. n.1.  *See Lomow*, 266 F.3d at

2  1019.  "[A] restitution order must be based on losses directly resulting *from the*

3  *defendant's criminal conduct*."  *Sablan*, 92 F.3d at 870 (emphasis added) (citing

4  *United States v. Barany*, 884 F.2d 1255, 1261 (9th Cir. 1989).  *See Berger*, 587

5  F.3d at 1044 (noting that the Supreme Court in *Dura Pharmaceuticals* was

6  "principally concerned with the plaintiff's ability to show that he suffered actual

7  loss caused directly – and exclusively – by the defendant's [fraud]").  "The amount

8  of restitution must be definite and limited by the amount actually lost by the

9  victims." *Laurienti*, 611 F.3d at 559 (citing *Barany*, 884 F.2d at 1260).

10  　　　　As shown in Sections IV.B and C above, the government has failed to

11  meet its burden of proving that any alleged victim on the Whelan list suffered any

12  actual loss directly and proximately caused by Mr. Showalter's conduct.

13  Accordingly, the Court cannot possibly fulfill its duty to make "an independent

14  determination as to the amount of loss the victim suffered as a result of the

15  defendant's conduct" based on that evidence.  *United States v. Najjor*, 255 F.3d

16  979, 984 (9th Cir. 2001).  In sum, the actual losses to victims must be offset by

17  either $18.628 million described in Part IV.B.2 above or $16.768 million described

18  in Part IV.C above, and either amount clearly offsets the $9.044 million of alleged

19  loss in the Whelan list.  In the absence of any evidence of actual loss, there is no

20  evidence supporting an award of restitution in any amount.

21  　　　　**F.**　　　**Mr. Showalter's Extraordinary Post-Sentencing Rehabilitation**

22  　　　　　　　**Warrants A Substantial Downward Variance.**

23  　　　　Regardless of the loss amount found by the Court, it should impose a

24  substantially lower sentence on resentencing because under *Pepper v. United*

25  *States*, Mr. Showalter is entitled to a downward variance for post-sentencing

26  rehabilitation.  Mr. Showalter's sentence was extreme for a first-time offender with

27  no criminal history and unnecessarily harsh given the offense conduct and failure of

28  proof as to actual loss or number of victims.  His extraordinary rehabilitation, taken

together with his age and serious health problems, amply warrant a downward variance from the otherwise applicable offense level.

### 1.    Mr. Showalter's Post-Sentencing Rehabilitation.

In *Pepper v. United States*, the Supreme Court held that where, as here, a defendant's original sentencing has been set aside on appeal, "a district court may consider evidence of a defendant's rehabilitation since his prior sentencing and that such evidence may, in appropriate cases, support a downward variance from the advisory Guidelines range." *Pepper*, 131 S. Ct. at 1241. The *Pepper* court recognized that evidence of post-sentencing rehabilitation provides a district court with the most "up-to-date picture of [a defendant's] 'history and characteristics,'" as well as "the most accurate indicator of his present purposes and tendencies," both of which are critical factors because "a court's duty is always to sentence the defendant as he stands before the court *on* the day of sentencing." *Id.* (emphasis added) (quoting 18 U.S.C. § 3553(a)). Failure to take into account post-sentencing rehabilitation may constitute reversible error. *See United States v. Diaz*, 639 F.3d 616, 616 (3d Cir. 2011); *United States v. Salinas-Cortez*, 660 F.3d 695, 698 (3d Cir. 2011).

The evidence Mr. Showalter has submitted to the Court in connection with resentencing demonstrates his substantial and successful efforts to rehabilitate himself during the more than four years he has been incarcerated. Darmer Decl. Exs. 122-191. The evidence of his rehabilitation falls into three categories: (1) educational and vocational training efforts directed at himself; (2) educational and training efforts directed at others; and (3) charitable activities directed at a wider community. As a result, Mr. Showalter is entitled to a substantial downward variance from the otherwise applicable Guidelines range under *Pepper*.

First, Mr. Showalter has diligently used his time in custody to improve himself by completing a number of classes that will enhance his ability to reenter society as a productive citizen. Darmer Decl. Exs. 129-135, 139-148. Mr.

1   Showalter has completed five substantive college classes through Santa Ana

2   College, *id.* Exs. 128-135, in which he demonstrated superb performance.  In

3   addition, the classes have helped Mr. Showalter acknowledge the many serious

4   mistakes in his business dealings based on his desire to achieve profits and

5   recognize that controlling the impulse towards greed is the first, critical step toward

6   rehabilitation.  *Id.* Ex. 122.

7        Second, Mr. Showalter spent a considerable amount of his 52 months

8   in jail to date helping fellow inmates, many of whom lack the formal education and

9   native abilities of Mr. Showalter.  *Id.* Exs. 148-168.  Mr. Showalter's extraordinary

10  contributions to the rehabilitation efforts of other inmates include:  teaching more

11  than 600 days of General Educational Development ("GED") classes; attending and

12  teaching 158 Adult Continuing Education classes; and, by serving as a tutor in a

13  variety of classes and, ultimately, serving as a tutor supervisor with responsibility

14  for managing other inmate tutors, in which role his BOP supervisor described him

15  as "one of the best, *if not the best*, tutor" that the supervisor ever had.  *Id.* Ex. 169.

16       Third, while incarcerated Mr. Showalter has experienced firsthand the

17  tragedy of adult illiteracy among his fellow inmates.  As a result, he has aided over

18  30 inmates who lack the ability to write letters and gather information on their own

19  that are relevant to their cases.  *Id.* Ex. 127.

20       In further efforts to help solve the illiteracy problem, Mr. Showalter

21  has undertaken a number of steps to help a wider community while in jail,

22  including: creating a nonprofit foundation to improve education named "Pennies for

23  Kidds® Foundation"; commencing publication of several novels to fund the non-

24  profit ventures; and otherwise supporting outside organizations involved in

25  promoting children's literacy.  Darmer Decl. Exs. 122, 176-181.

26       However, Mr. Showalter's repair of his familial relationships is

27  perhaps the most significant evidence of his rehabilitation.  "Prison reform

28  literature has consistently found that inmates who learn how to repair and maintain

their family relationships have lower recidivism rates." Darmer Decl. Ex. 186, at 2. *See id.* Exs. 184-189. Mr. Showalter entered prison with extremely strained or non-existent family relationships, but has used his time in prison to repair them. *Id.* Exs. 123-126 (Letters of support from Mr. Showalter's two daughters, sister and father). In sum, because Mr. Showalter has substantially rehabilitated himself, and because that post-sentencing rehabilitation is critical to the relevant section 3553 factors, a substantial downward variance under *Pepper* is warranted.

> ## 2. Mr. Showalter Has Already Served a Sentence That Is Sufficient, but Not Greater Than Necessary and No Further Prison Time Is Warranted.

Given his lack of any criminal history and background, and considering the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct under section 3553(a)(6), a significant downward variance in the otherwise applicable Guidelines range is warranted. The government seeks a sentence of 151 months, a sentence that dwarfs sentences meted out by judges in this District, which averaged a mere 35 months' imprisonment for all fraud convictions in 2011, including sentences of defendants with much more substantial criminal histories who pose greater recidivism risks. Darmer Decl. Ex. 192. A 151-month sentence is excessive in comparison with sentences for fraud convictions within this Circuit and nationwide, which have reported sentences of 35 and 30 months, respectively, and median sentences of 24 and 18 months, respectively. *Id. See id.* Ex. 195. Average sentences for *every* reported category of conviction in the Ninth Circuit, with the exception of murder, were substantially less than 151 months. Darmer Decl. Ex. 192.

Department of Justice ("DOJ") statistics similarly reflect substantially lower sentences for fraud convictions, averaging 28.1 months in 2010. *Id.* Ex. 193. DOJ reports that wire fraud sentences nationwide averaged 43.9 months in 2010.

1  *Id.*  The DOJ statistics do not include probationary sentences and nearly 20 percent

2  of sentences in fraud cases consisted of probation only.  *See id.*  Remarkably, the

3  151-month sentence sought by the government in this case also exceeded the

4  average sentence imposed by district courts for all defendants convicted of violent

5  crimes, which is 96.6 months.  *Id.* at 1.  Even sentences imposed for sex offenses,

6  which tend to be particularly punitive, average 111 months, 40 months less than the

7  sentence sought by the government here.  *Id.* at 3; *see* Darmer Decl. Ex. 194.  The

8  only crimes for which the average sentences were greater than the 151 months

9  sought by the government here were homicide, kidnapping and carjacking.  *See*

10  Darmer Decl. Ex. 193, at 1.

11      In addition, a sentence of 151 months would create unwarranted and

12  inappropriate sentencing disparities and would be inconsistent with the factors to be

13  considered under section 3553(a).

14      First, considerations of general deterrence under section 3553(a)(2)(B)

15  do not warrant a sentence of imprisonment of that length.  General deterrence aims

16  to discourage others from committing crimes.  The fact that Mr. Showalter, a

17  college-educated family man with no prior criminal history, has already served

18  more than four years in prison for his offense will doubtless provide a powerful

19  deterrent to any rational, similarly situated person, particularly given the notable

20  failure of the government to bring charges or obtain lengthy sentences against any

21  highly placed individuals who played a role in the recent financial crisis, such as

22  Angelo Mozilo, among others.  *See id.*; *see also* Exs. 196-197, 235.

23      Second, considerations of specific deterrence under section

24  3553(a)(2)(C) do not warrant a sentence of imprisonment.  Section 3553(a)(2)(C)

25  directs the court to consider the need to protect the public from further crimes of the

26  defendant.  Because of Mr. Showalter's lack of a criminal history, age and

27  remarkable rehabilitation while in prison, a sentence of probation, together with a

28  condition of home confinement and/or community confinement, or other

1  restrictions would more than adequately serve the purposes of specific deterrence

2  because society has nothing more to fear from Mr. Showalter.  *See* Darmer Decl.

3  Exs. 122-126, 184, 186-192. *See, e.g.*, U.S.S.G. §§ 5B1.1, 5D1.1, 5F1.1 and 5F1.2.

4  Third, as demonstrated above, Mr. Showalter no longer has any need

5  for correctional treatment that would be more readily available to him in prison.

6  Section 3553(a)(2)(D) requires that the Court consider the necessity of the sentence

7  imposed "to provide the defendant with needed educational or vocational training,

8  medical care, or other correctional treatment in the most effective manner."  18

9  U.S.C. § 3553(a)(2)(D).  The government has not pointed to or shown the need for

10  any correctional treatment for Mr. Showalter, and thus this factor weighs in favor of

11  a sentence of time served, community confinement or home detention.

12  Fourth, sections 3553(a)(3) and (4) mandate that the sentencing Court

13  consider the "kinds of sentences available," including non-custodial sentences, in

14  determining what sentence is sufficient, but not more than necessary to fulfill the

15  requirements "that Congress has expressly instructed district courts to consider at

16  sentencing." *Pepper*, 131 S. Ct. at 1242.  Given the extraordinary post-sentencing

17  rehabilitation achieved by Mr. Showalter, the Court must consider the non-custodial

18  sentencing alternatives that are available to it.  These include probation, community

19  confinement, home detention, community service and occupational restrictions.

20  *See* 18 U.S.C. §§ 3561, 3583 (2006); U.S.S.G. §§ 5F1.1, 5F1.2, 5F1.3, and 5F1.5

21  (2011); *see also* 28 U.S.C. § 994(j) (2006) ((noting "general appropriateness of

22  imposing a sentence *other* than imprisonment in cases in which the defendant is a

23  first [time] offender who has not been convicted of a crime of violence or an

24  otherwise serious offense.") (emphasis added)).  To the extent that the Court has

25  any remaining concerns about Mr. Showalter's ability to reenter society, it can and

26  should use the available tools of non-custodial confinement to resolve those

27  concerns.  U.S.S.G. §§ 5B1.1, 5D1.1.  For example, if the Court needs more

28  evidence beyond Mr. Showalter's statement that he will not ever work in the area of

real estate, finance or mortgages again, Darmer Decl. Ex. 122, the Court can impose an express occupational requirement as a condition of probation or supervised release.  18 U.S.C. §§ 3563(b)(4), 3583(d).

Fifth, consideration of the need to avoid unwarranted sentence disparities among defendants with similar records, does not warrant a sentence of imprisonment.  As discussed, Mr. Showalter's prior sentence was radically higher than both national and local averages for the same offense.  Likewise, his 151 month sentence is substantially higher than this Court's recent sentences in high profile fraud cases, including former Orange County Assistant Sheriff George Jaramillo (27 months); former Orange County Sheriff Michael Carona (66 months); attorney Jeanne Rowzee (87 months); and attorney Gerald L. Wolfe (46 months), with the latter defendants not only attorneys but also guilty of offense conduct resulting in losses exceeding $20 million, substantially more than the zero loss the government has proven here.  Darmer Decl. Exs. 236-238, 243, 248-250.

### 3.    A Downward Variance Is Warranted Based on Mr. Showalter's Age and Serious Health Problems.

When a court grants a downward variance under section 3553(a) it "must consider, among other things, a defendant's 'history and characteristics,' § 3553(a)(1)." *Pepper*, 131 S.Ct. at 1233.  *United States v. White*, 506 F.3d 635, 644 (8th Cir. 2007) ("[D]istrict courts are not only permitted, but required, to consider 'the history and characteristics of the defendant.'") (quoting 18 U.S.C. § 3553(a)(1)).  Thus, even though factors such as age and medical condition may not suffice for a downward departure, these same factors may form the basis for a variance.  *White*, 506 F.3d at 644.  Of course, section 3553(a) emphasizes that a sentencing court must consider the need "to provide the defendant with needed educational or vocational training, *medical care*, or other correctional treatment." *Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (quoting 18 U.S.C. § 3553(a)) (emphasis added).  "Age may be a reason to depart downward in a case in which the defendant

1    is elderly and infirm and where a form of punishment such as home confinement

2    might be equally efficient as and less costly than incarceration."  U.S.S.G. § 5H1.1.

3    Similarly, a downward variance may be warranted where a defendant suffers from

4    "an extraordinary physical impairment."  U.S.S.G. §§ 5H1.1 and 5H1.4.  "[T]he

5    standards governing departures do not bind a district court when employing its

6    discretion with respect to variances."  *United States v. Chase*, 560 F.3d 828, 832

7    (8th Cir. 2009).

8            The Ninth Circuit has long since recognized that where, as here, a

9    defendant suffers from a serious condition or illness those circumstances may

10   support a downward departure or variance.  *See United States v. Clough*, 360 F.3d

11   967, 970 (9th Cir. 2004); *United States v. Anders*, 956 F.2d 907, 912 (9th Cir.

12   1992); *United States v. Garcia*, 340 F.3d 1013, 1019 (9th Cir. 2003) (remanding to

13   district court to allow defendant Garcia to develop a fuller record with regard to his

14   lymphoma for which he was undergoing chemotherapy).  Recently, another court

15   relied on *Garcia* and "granted a generous variance downward in sentencing the

16   Defendant," as a result of a condition requiring the defendant to undergo surgery to

17   have a cancerous prostate removed.  *United States v. Gerrard*, CR No. 10-00804

18   DAE, 2011 WL 5190951, at *8 (D. Haw. Oct. 28, 2011) (defendant was unable to

19   leave home for more than a few hours at a time and the necessity of removing

20   prostrate coupled with his advanced age made "the hardships of prison unusually

21   harsh"); Darmer Decl. Ex. 242 (unpublished opinion).

22           As discussed below, Mr. Showalter's skin cancer is serious and

23   potentially life threatening.  Based on his past experience, that cancer is highly

24   likely to worsen if he is incarcerated for an additional period of time where he is

25   unlikely to receive the care he requires.  Where, as here, Mr. Showalter's age and

26   lack of criminal history points highly reduce his likelihood of recidivism and he

27   suffers from a progressive, worsening form of skin cancer in addition to a variety of

28   other serious health issues, including gout, diabetes and high cholesterol, a

1  downward variance under section 3553(a) is warranted.  PSR ¶¶ 68-69; *United*
2  *States v. Warr*, 530 F.3d 1152, 1157 (9th Cir. 2008) (referring to a "study done by
3  the federal Bureau of Prisons measuring how age and criminal history category
4  affect an offender's likelihood of recidivism," and noting "that, … recidivism rates
5  drop markedly when a person reaches the age of '35 or 40'); *see supra* Part IV.E.1;
6  *see also* Darmer Decl. Exs. 190, at 14, 30.

7       In the nearly four and one-half years that he has been in prison, Mr.
8  Showalter's health problems have worsened.  Most alarmingly, his skin cancer has
9  metastasized to a more severe form of cancer.  *See* Darmer Decl. Exs. 198-205.
10 Specifically, prior to sentencing, Mr. Showalter had been diagnosed with at least 12
11 recurrences of basal cell carcinoma.  Darmer Decl. Ex. 203.  By April of 2012, he
12 had developed a more severe type of skin cancer, squamous cell carcinoma, which
13 required immediate surgery utilizing a highly specialized procedure known as Mohs
14 surgery.  *Id.* at 1; Darmer Decl. Exs. 200-202.  Because of his development of this
15 severe and dangerous form of skin cancer, Mr. Showalter's doctor, Dr. Carlin, had
16 urged prompt surgery, which was delayed due to lack of response from the jail.
17 Darmer Decl. Ex. 203, at 3.  *See* Darmer Decl. Ex. 204.  In sum, without continued
18 and timely proper treatment of Mr. Showalter's skin cancer, there could be dire
19 health consequences up to and including death.  *Id.* at 1.

20      Mr. Showalter also now has a much higher probability of developing
21 melanoma carcinoma, the most deadly form of skin cancer and he is in danger that
22 his cancer will spread quickly to other body parts, including internal organs and
23 lymph nodes.  *Id.* at 3.  Mr. Showalter requires vigilant treatment and consistent
24 medical examinations by his dermatologist to ensure that his skin cancer condition
25 does not worsen, or if it does, that it is treated in a timely manner with surgery to
26 minimize the negative and potentially life threatening repercussions.  *Id.*  Given the
27 historical inadequacy of treatment of Mr. Showalter's skin cancer condition while
28 incarcerated and given the small likelihood that any minimum security facility to

1   which he would likely be designated will have the necessary medical facilities, a

2   non-custodial sentence is required to meet Mr. Showalter's urgent medical needs.

3          Additionally, Mr. Showalter has been struggling with gout for 25

4   years.  *See* PSR ¶ 68.  Gout is characterized, by its "sudden, severe attacks of pain,

5   redness and tenderness in joints."  Darmer Decl. Exs. 210-212.

6          Further, Mr. Showalter suffers from Type I Diabetes, a devastating

7   disease (the *seventh leading cause of death* in this country ) that he was diagnosed

8   with in 2006.  Darmer Decl. Ex. 213.  *See* PSR ¶ 68.  In fact, his life expectancy

9   may be reduced by ten to 20 years.  "People with type 1 diabetes can expect their

10  longevity to reduce by over 20 years."  Darmer Decl. Exs. 206-207.  *See also id.* at

11  209.  Based on the Actuarial Life Table, an average healthy 60 year-old male can

12  expect to live to about 81 years old.  *Id.* at 208.  In contrast, a 60 year-old male

13  suffering from Type I Diabetes has a life expectancy of approximately 61 to 71

14  years.  It is also well-settled that diabetics are more vulnerable to infections.  *See*

15  Darmer Decl. Ex. 231.  Of course, this is a particularly dangerous risk factor for

16  someone who is incarcerated given the close quarters and illnesses among the

17  general prison population.

18         Finally, there is a real concern that Mr. Showalter's high cholesterol

19  could lead to coronary artery disease.  *See* Darmer Decl. Ex. 232. To further

20  complicate matters, studies show that "[s]unlight deficiency could increase blood

21  cholesterol by allowing squalene metabolism to progress to cholesterol synthesis

22  rather than to vitamin D synthesis as would occur with greater amounts of sunlight

23  exposure."  Darmer Decl. Ex. 233.  Therefore, in addition to facing a serious risk of

24  heart disease as a result of his high cholesterol, Mr. Showalter is also facing a

25  paradox as a result of the contradictory indications arising from his different

26  medical problems.  On the one hand, Mr. Showalter needs to avoid sunlight as

27  much as possible to protect himself from exacerbating his spreading squamous cell

28

1  skin cancer, while on the other hand, sunlight deficiency puts him at an increased

2  risk for coronary heart disease.  Darmer Decl. Exs. 203, 233.

3          Because of his age and medical conditions, Mr. Showalter should be

4  released early.  *See United States v. Whitmore*, 35 Fed. Appx. 307, 321 (9th Cir.

5  2002) ("[G]iven the defendant's age combined with [his] infirmities, I believe that a

6  sentence of 46 to 57 months is unduly harsh, it is far more punitive than that same

7  sentence would be on a person of middle age. . .  [A]ge may be a basis for

8  downward departure where the defendant is elderly and infirm and where other

9  forms of punishment would be equally efficient."); Darmer Decl. Ex. 247

10  (unpublished opinion).

11          Additionally, since home confinement would "be equally efficient as

12  and less costly than incarceration," the Court should grant a downward variance.

13  U.S.S.G. § 5H1.1.  Given Mr. Showalter's substantial medical needs for treatment

14  of his skin cancer and other health problems, Mr. Showalter will have to be

15  transferred within the BOP system for treatment very frequently to obtain the

16  requisite care for the specialized surgery urged by his dermatologist.  Darmer Decl.

17  Ex. 203.  As such, it makes no sense from a cost-benefit analysis either for the

18  government to house him in a high-level security (which is substantially more

19  expensive to operate on a per-inmate basis) or to pay the costs of regularly

20  transferring him within the BOP system to obtain the necessary treatment.  As a

21  result of Mr. Showalter's condition, he likely will need to be removed from his low

22  security prison camp to one of the three main BOP medical facilities on a very

23  frequent basis.  This increased time spent in transit will likely expose him to further

24  sunlight and increase his risk of developing melanoma carcinoma.  While it may be

25  easy to say that Mr. Showalter would receive the needed protection within the

26  prison system, there is already evidence that he has not received such protection

27  and as a result has developed a serious sunburn.  *See* Darmer Decl. Ex. 198.  Mr.

28  Showalter suffered a severe sunburn during a prior transit within the BOP system

1  when the supervisory personnel refused to give him a hat or any protection and

2  required him to remain standing directly exposed to the sun for an extended period

3  of time.  *See id.*  Dr. Carlin has expressed his concern that any exposure to sunlight

4  without adequate protection, even once, could result in Mr. Showalter developing

5  melanoma.  Darmer Decl. Ex. 203.  As Dr. Carlin states, a person like Mr.

6  Showalter who is prone to skin cancer may be one sunburn away from developing a

7  much more serious condition.  *Id.*

8  **V.   CONCLUSION.**

9       For all the reasons set forth above, the government has failed to meet its

10  burden of proving by clear and convincing evidence specific sentencing

11  enhancements of 24 levels resulting from actual loss or more than 50 victims and

12  thus the Court should find that Mr. Showalter's adjusted offense level is nine.  With

13  zero criminal history points and a Criminal Offense Category of I, the Court should

14  find that the resulting sentencing range is four to ten months' imprisonment.  Given

15  that Mr. Showalter has already served more than 52 months in prison, no further jail

16  time is warranted under the section 3553(a) factors, the advisory Guidelines or

17  *Pepper v. United States*.  Likewise, there is no basis for a restitution award given

18  the government's failure of proof of any actual loss, much less loss in excess of $9

19  million.

20  Dated:  July 12, 2012                    JONES DAY

21

22                                          By: /s/ Roman E. Darmer

23                                               Roman E. Darmer

24                                          Attorney for Defendant
                                            EDWARD R. SHOWALTER

25

26

27

28

## CERTIFICATE OF SERVICE

I, Roman E. Darmer, declare that I am a citizen of the United States and employed in Orange County, California.  I am over the age of eighteen years and not a party to the within-entitled action.  My business address is 3161 Michelson Drive, Suite 800, Irvine, California  92612.  On **July 12, 2012**, the following documents described as:

**DEFENDANT EDWARD SHOWALTER'S AMENDED POSITION REGARDING RESENTENCING**

☒  were served by the Court via notice of electronic filing ("NEF") to the person(s) at the e-mail address(es) set forth below:

Andrew D. Stolper
AUSA - Office of U.S. Attorney
Criminal Division
Email: USACAC.SACriminal@usdoj.gov,
andrew.stolper@usdoj.gov

☒  by placing document(s) in a sealed envelope with postage thereon fully prepaid, in the United States mail at Irvine, California addressed as set forth below.

Mr. Edward Showalter
Federal Register No. 43152-112
Santa Ana Jail M-88
P.O. Box 22003
Santa Ana, CA  92702

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing an affidavit.

Executed on **July 12, 2012**, at Irvine, California.

*/s/ Roman E. Darmer*_____
Roman E. Darmer

IRI-40568v6